[No. C050766. Third Dist. Jan. 26, 2007.]

GEORGETTE GILBERT, Plaintiff, Cross-defendant and Appellant, v. JONATHAN SYKES, Defendant, Cross-complainant and Respondent.

**COUNSEL**

DLA Piper Rudnick Gray Cary US, Kathryn E. Karcher, Megan Whyman Olesek, Jerold L. Hersh, Gregory J. Lundell; Sheppard Mullin Richter & Hampton, Guylyn R. Cummins, James M. Chadwick; Nolen, Saul & Brelsford, Nolen & Associates and Rudy Nolen for Plaintiff, Cross-defendant and Appellant.

Wilke, Fleury, Hoffelt, Gould & Birney, Philip R. Birney, Danielle M. Guard and Daniel L. Baxter for Defendant, Cross-complainant and Respondent.

**OPINION**

**BUTZ, J.**—In our youth and celebrity worshipping culture, the benefits and risks of plastic surgery are a hot topic. The number of people, especially women, who have had minimally invasive cosmetic surgery has grown exponentially in the past several years.

Jonathan Sykes, M.D., is a prominent professor and practitioner of plastic and reconstructive surgery at the University of California, Davis, Medical Center (UC Davis Medical Center) in Sacramento. Sykes performed a series of facial cosmetic procedures on Georgette Gilbert in February 2003. Gilbert

was appalled at the results. She not only sued Sykes for medical malpractice, but created a Web site relating her experiences with Dr. Sykes (including *before* and *after* photos), as well as information and advice for those considering plastic surgery.

Sykes filed a multitort cross-complaint in the malpractice action, alleging he was defamed and suffered loss of business as a result of false and misleading statements appearing on Gilbert's Web site. Gilbert responded with a special motion to strike the cross-complaint. (Code Civ. Proc., § 425.16.)[1] The trial court denied the motion, finding that Sykes had established a probability of prevailing on his cross-complaint.

■ Exercising our power of independent review, we shall reverse. While we agree with the trial court's finding that the cross-complaint qualified for SLAPP[2] treatment under the statute, we conclude, contrary to the trial court's finding, that Sykes was a limited purpose public figure and therefore had the burden of making a prima facie showing that the statements on the Web site were both false and published with actual malice. Because we find that Sykes failed to carry that burden, we shall vacate the order with directions to grant Gilbert's motion.

## FACTUAL BACKGROUND

*The Surgery*

Dr. Sykes is the director of facial plastic and reconstructive surgery at UC Davis Medical Center in Sacramento. Sykes was profiled in a 2003 article in Sacramento Magazine entitled *Top Doctors*, which lauds him as "a nationally recognized educator and leader in minimally invasive esthetic and laser surgery[,] [who] has performed over 10,000 surgical procedures, is board-certified in otolaryngology and facial plastic surgery, and has published three books and over 90 articles on facial plastic surgery."

Gilbert became interested in plastic surgery after another doctor recommended that she might benefit from a brow lift. She approached Sykes because she was acquainted with him and thought of him as a friend. After consulting with Sykes, Gilbert agreed to undergo five separate plastic surgical procedures to her face. Sykes told her that the goal was to make her look

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] "SLAPP stands for 'Strategic Lawsuit Against Public Participation.' " (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 835, fn. 1 [111 Cal.Rptr.2d 582].) For clarity, we refer to a "SLAPP" or "anti-SLAPP" motion as a "special motion to strike"—the language used in the statute (§ 425.16, subd. (b)(1)).

natural after the surgery and that "we didn't want to make too much change." The surgery was performed in February 2003.

During an April 2003 postsurgical visit, Sykes told Gilbert the results were "very good and improving." Gilbert did not agree. She was extremely unhappy with the results, asserting that she could not fully close her eyes, her eyebrows were higher than she expected, one eyebrow was higher than the other and she had a permanently "surprised" look on her face. Beginning in late June 2003 Gilbert underwent four revision surgeries, performed by other doctors, to correct her problems.

In May 2004, Gilbert brought a malpractice suit against Dr. Sykes and the Regents of the University of California (the Regents) in connection with the surgery performed by Sykes.

*Gilbert's Web site*[3]

In late February or early March 2005, Gilbert established a Web site (with the address <http://www.mysurgerynightmare.com> [as of Jan. 26, 2007]) (hereafter Web site). The Web site contains five hyperlinks (or links that take the reader to an additional page of information), which we discuss below:

At the home page of the Web site, Gilbert explains: "I started this Web site so I can share my experience with plastic surgery. My hopes are to inform and educate because when I originally looked into cosmetic surgery on the Internet there was very little information from a patients [*sic*] perspective, but a lot of information coming from the doctor's perspective. [¶] I will share my experience with plastic surgery and show my original (untouched) before and after photos. If you still wish to pursue plastic surgery after reading my story, I hope you learn from the information I provide so you can make the best educated decision possible before going under the knife. I will give you information and links on how to check what your doctor is certified in, any past lawsuits, information on what to ask during your consult, and give you my take on what red flags to look out for." The home page also lists several malpractice lawsuits that have been filed or are pending against Dr. Sykes.

The "Before and After Photos" link takes the viewer to two pairs of photographs taken before and after the surgery performed by Sykes—one full view of Gilbert's face and another of just her eyes. Both *after* pictures are captioned "Approximately [five] months after surgery." The *after* photographs

---

[3] We use the preferred spelling of "Web site" throughout this opinion.

show Gilbert with a surprised, eyes-wide-open look. Above the eye photographs, Gilbert inserted the following caption: "I was told by my doctor that this was a good result—that I looked better after his surgery—what do you think?"

At the "Selecting a Doctor" link, a page of "useful information" features tips on selecting a plastic surgeon, advice which Gilbert states is "my OWN opinion after consulting with revision doctors all over the United States, having multiple revisional surgeries, and just researching as much as possible."

At the "Red Flags" link, Gilbert discusses "Things to look out for" with disclaimers describing certain traits under the heading, "Doctors I would be cautious of."

The "Final Thoughts/Contact Me" link recounts Gilbert's experience with Sykes. She said that Sykes told her she would look natural after the surgery and she was under the impression the change would be subtle. Instead, she wrote, the "surgery was the biggest regret of my life. I didn't need [five] procedures and I had no idea what I was really getting myself into. What I thought was going to be subtle turned into a nightmare. I've spent over two years of my life meeting with doctors all over the United States and having revision surgeries in hopes to get back to how I once looked or at the very least look normal again."

*Litigation*

When Gilbert did not submit to Sykes's request to close down her Web site, Sykes and the Regents filed a cross-complaint for damages and injunctive relief[4] based on publications appearing on the Web site that were allegedly defamatory and caused Sykes emotional distress and loss of business. The crucial charging accusations of the cross-complaint appear in paragraph 7, which states:

"In late February or early March 2005, . . . [Gilbert] established a Web site at www.mysurgerynightmare.com (Web site). In this Web site, [Gilbert] (after identifying Dr. Sykes as the 'director of facial plastic and reconstructive surgery at [UC Davis] Medical Center') presents, inter alia, misleading '*before*

---

[4] Sykes abandoned his attempt to force Gilbert to shut down her Web site after the trial court denied his ex parte application for a temporary restraining order.

and *after'* facial photographs in connection with the procedures performed by Dr. Sykes (photos that were taken after additional and significant cosmetic surgery procedures not performed by Dr. Sykes), falsely indicates that Dr. Sykes recommended and performed procedures that [Gilbert] did not need/want, misstates the content of communications between [Gilbert] and Dr. Sykes relating to the procedures performed by Dr. Sykes, and falsely suggests that Dr. Sykes was compensated for the procedures 'under the table.' "

Sykes also alleged that Gilbert obtained from Google or possibly other search engines a "sponsored link," such that a search for "Jonathan Sykes" would bring up a link to Gilbert's Web site.

Gilbert responded by filing a special motion to strike the cross-complaint (see fn. 2, *ante*). Her moving papers claimed that the Web site's publications were protected by the First Amendment, and that neither Sykes nor the Regents could establish an actionable claim for defamation or any other tort.

Evidence was submitted by both sides and the trial court held a hearing on the matter. The court ultimately issued an order granting the special motion as to the Regents but denying it as to Sykes. While finding that section 425.16 applied to the cross-complaint, the court also ruled that Sykes was not a limited purpose public figure, which would have required a showing that Gilbert's statements were uttered with actual malice. Stated the court: "The fact he has published articles and books on plastic surgery and appeared on television shows does not mean there is a public controversy relating to Ms. Gilbert's plastic surgery." Finding that Sykes had made the requisite prima facie showing that Gilbert defamed him with respect to the *before* and *after* photos as well as statements appearing on the Web site, the court denied the special motion to strike.

The Regents have not appealed from the order dismissing them as cross-complainants. Gilbert appeals from the order denying her special motion to strike as to Sykes.

## DISCUSSION

### I.   General Principles

"Code of Civil Procedure section 425.16 was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. [Citation.] These meritless suits, referred to under the acronym SLAPP, . . . are subject to a special motion to strike unless

the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677] (*Sipple*), fn. omitted, citing *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46] & § 425.16, subd. (b)(1).) "Claims based on these acts are subject to a special motion to strike unless the court determines that the plaintiff has established that there is a probability of prevailing on the merits." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1575–1576 [27 Cal.Rptr.3d 863] (*Ampex*).)

" 'If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish " 'a probability that the plaintiff will prevail on the claim,' " i.e., "make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor." ' " (*Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1417 [103 Cal.Rptr.2d 174].)

The trial court's ruling on a section 425.16 motion is reviewed de novo. (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1544 [33 Cal.Rptr.3d 145] (*Terry*).) We exercise our independent judgment to determine not only whether the anti-SLAPP statute applies, but whether the complainant has established a reasonable probability of prevailing on the merits. (*Ibid.*)

## II. Whether Section 425.16 Applies

Before reaching the merits of the order, we must address Sykes's initial contention that, contrary to the trial court's ruling, section 425.16 did not even apply to the cross-complaint.[5]

■ A lawsuit qualifies for a special motion to strike under section 425.16 if it arises from an act " 'in furtherance of the person's right of petition or free speech under the United States or California Constitution.' " (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 892 [17 Cal.Rptr.3d 497] (*Wilbanks*), quoting § 425.16, subd. (b)(1).) The statute defines acts in furtherance of free speech or petition as including statements that are made (1) in a public forum and (2) in connection with an issue of public interest. (*Wilbanks*, at p. 892, citing § 425.16, subd. (e).)

---

[5] Although he did not file a cross-appeal, Sykes has standing to make this argument for the purpose of demonstrating that the trial court errors of which Gilbert complains caused her no prejudice. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶ 8:196, p. 8-124; see Code Civ. Proc., § 906.)

While not contesting that the Internet is a public forum, Sykes maintains that the Web site does not concern a matter of public interest. He points out that "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Wilbanks, supra,* 121 Cal.App.4th at p. 898.) Sykes asserts that statements on the Web site do not contribute to the public debate because they only concern Gilbert's interactions with *him.* He is wrong.

The public interest requirement of section 425.16, subdivision (e)(3) must be " 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808 [119 Cal.Rptr.2d 108] (*Seelig*).) The Legislature inserted the "broad construction" provision out of concern that judicial decisions were construing that element of the statute too narrowly. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120 [81 Cal.Rptr.2d 471, 969 P.2d 564], citing Stats. 1997, ch. 271, § 1.)

Sykes does not dispute that plastic surgery is a subject of widespread public interest and discussion. Indeed, a Google search (at <http://www.google.com/> [as of Jan. 26, 2007]) using the words "pros" "cons" "cosmetic" and "surgery" returns a virtual deluge of articles and Web sites devoted to the well-known controversy surrounding plastic surgery. Elective cosmetic surgery was the subject of the popular television series *Extreme Makeover*, in which it is portrayed as a positive, life-transforming event. Yet the widespread and indiscriminate use of plastic surgery by celebrities and the public has also generated a firestorm of negative publicity and comment. (See, e.g., *Awful Plastic Surgery—The good, bad, and ugly of celebrity plastic surgery* <http://www.awfulplasticsurgery.com> [as of Jan. 26, 2007]; Kuczynski, Beauty Junkies: Inside Our $15 Billion Obsession With Cosmetic Surgery (2006).)

Sykes is a widely known plastic surgeon, practicing at a prestigious medical institution, who has written numerous articles on plastic surgery, appeared on local television shows on the subject and advertised in the Sacramento media market.

Gilbert's Web site contributed toward the public debate about plastic surgery in at least two ways: First, assertions that a prominent and well-respected plastic surgeon produced "nightmare" results that necessitated extensive revision surgery contributes toward public discussion about the benefits and risks of plastic surgery in general, and particularly among persons contemplating plastic surgery as a means of looking younger or improving their appearance. (See *Terry, supra,* 131 Cal.App.4th at p. 1547

[allegations that a church leader engaged in an inappropriate relationship with a teenage minor in his congregation constituted a matter of public interest because it implicated "society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe"]; *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1161 [15 Cal.Rptr.3d 100] (*Annette F.*) [charges of domestic abuse by a lesbian partner in a couple that had achieved national prominence through adoption litigation was an issue of public interest because it "potentially affected a large number of children and adoptive parents beyond the direct participants"]; *Sipple, supra,* 71 Cal.App.4th at p. 238 [wife-beating allegations against prominent political consultant raised issue of public interest, where he "was able to capitalize on domestic violence issues in order to further his career"].)

Second, a review of the entire Web site shows that it is not limited to Gilbert's interactions with Sykes. The Web site contains advice, information and a contact page where readers can share their own experiences. At the Selecting a Doctor link, a page on "Useful Information" has tips on choosing a plastic surgeon, including references to other Web sites and resources. A Red Flags link lists "Things to look out for" or warning signs to look for when selecting a doctor to perform the surgery. A Final Thoughts/Contact Me link features Gilbert's ruminations about plastic surgery in general, not all of it negative. Clearly, the Web site was not limited to attacking Sykes, but contributed to the general debate over the pros and cons of undergoing cosmetic surgery.

For the foregoing reasons, we agree with the trial court's finding that Gilbert's Web site concerned a matter of public interest within the meaning of section 425.16.

### III. Limited Purpose Public Figure

The most important question we face is whether Sykes was a limited purpose public figure for purposes of his defamation claims. "*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845–846 [52 Cal.Rptr.2d 831] sets forth the elements that must be present in order to characterize a plaintiff as a limited purpose public figure. First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." (*Ampex, supra,* 128 Cal.App.4th at p. 1577.)

Contrary to the trial court's ruling, Sykes stands out as an archetypical example of a "limited purpose" or "vortex" public figure. (*Annette F., supra,* 119 Cal.App.4th at p. 1163.) As we have explained, the relative merits of plastic surgery is a subject that has garnered national attention and is the focus of widespread public interest. Gilbert produced evidence showing that Sykes has thrust himself into that debate by appearing on local television shows as well as writing numerous articles in medical journals and beauty magazines, touting the virtues of cosmetic and reconstructive surgery. Sykes has also testified as an expert witness on the subject and advertised his services in the local media.

These facts provide compelling proof that Sykes "undertook 'some *voluntary* act through which he seeks to influence the resolution of the public issues involved,' " and took " 'affirmative actions' " to thrust himself into the " 'forefront of [a] particular public controvers[y].' " (*Copp v. Paxton, supra,* 45 Cal.App.4th at p. 845 (*Copp*), quoting *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254–255 [208 Cal.Rptr. 137, 690 P.2d 610].) It is not even necessary to show that Sykes actually achieved prominence in the public debate. It is sufficient that he " 'attempt[ed] to thrust himself into the public eye' [citation] or to influence a public decision." (*Copp, supra,* at pp. 845–846.)

Sykes attempts to avoid this conclusion by playing fast and loose with the definitions. Sykes argues he was not a limited purpose public figure because there was no preexisting public " 'controversy' *regarding the procedures performed by Dr. Sykes on Ms. Gilbert.*" (Italics added.) This claim is at war with the concept of a limited purpose public figure.

A person *becomes* a limited purpose public figure by injecting himself into the public debate about a topic that concerns a substantial number of people. Once he places himself in the spotlight on a topic of public interest, his private words and conduct relating to that topic become fair game. Sykes would turn this formulation on its head. He would require that the plaintiff generate a broad public controversy through private words or conduct before he could be deemed a public figure, an atrophic definition that would virtually eliminate all vortex public figure candidates.

If a complainant's private conduct had to generate a public controversy before he could be deemed a public figure, those who exposed his controversial behavior in the first place would face defamation liability for inaccurate statements made in good faith, while those who joined in the discussion afterward would be immune from such claims unless it was shown that their statements were uttered with malice. That is not the law. Indeed, defamation decisions finding the complainants to be vortex public figures have typically

involved persons who claimed they were defamed for private conduct *after* they injected themselves into matters of general public discussion or controversy. (See, e.g., *Terry, supra,* 131 Cal.App.4th at pp. 1547–1548; *Sipple, supra,* 71 Cal.App.4th at p. 238; *Copp, supra,* 45 Cal.App.4th at pp. 846–847.)

Here, Sykes's sought-after prominence as an expert in and advocate for plastic surgery as a means of personal enhancement transformed him into a limited purpose public figure. As such, statements alleging that his surgical procedures resulted in disfigurement or required expensive multiple corrective surgeries are entitled to constitutional protection.

We conclude that Sykes was a vortex public figure who invited public attention and comments regarding his surgical practice. Thus, to prevail on a defamation claim, he was required to prove by clear and convincing evidence not only that Gilbert's claims were false, but that they were uttered with actual malice. (*Annette F., supra,* 119 Cal.App.4th at p. 1166.)

Having resolved these preliminary but important issues, we turn to the specific allegations of the cross-complaint and whether Sykes met his burden of producing prima facie evidence to support his defamation claims.

## IV. Probability of Success

Since Gilbert established that she was sued after exercising her First Amendment right to free speech in a public forum in connection with an issue of public interest, the burden shifted to Sykes to establish that there is a probability he will prevail on his claims. (§ 425.16, subd. (b)(1); *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1496 [45 Cal.Rptr.2d 624].) To meet this burden, Sykes must " 'demonstrate the [cross-]complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citation.] 'The burden on the plaintiff is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment.' " (*Seelig, supra,* 97 Cal.App.4th at p. 809.) The showing must be made through "competent and admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236 [132 Cal.Rptr.2d 57] (*Tuchscher*); see also *Evans, supra,* 38 Cal.App.4th at pp. 1497–1498.) Thus, declarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded. (See *Tuchscher, supra,* at pp. 1238, 1240.)

"In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant

(§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*).)

■ "Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1179 [96 Cal.Rptr.2d 136] (*Ringler*).) "There can be no recovery for defamation without a falsehood. [Citation.] Thus, to state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is *provably false*. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [111 L.Ed.2d 1, 18, 110 S.Ct. 2695].) 'Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." [Citations.] Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. [Citations.]' [Citation.] The dispositive question after the *Milkovich* case is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion." (*Seelig, supra*, 97 Cal.App.4th at p. 809, italics added).)

Sykes alleges that Gilbert's Web site defamed him in four different ways: (1) presenting misleading *before* and *after* facial photographs in that the *after* photos were taken after "additional and significant cosmetic surgery" performed by others; (2) falsely indicating that Sykes recommended and performed procedures that Gilbert did not need or want; (3) misstating "the content of communications" relating to the procedures he performed; and (4) falsely suggesting that Sykes was compensated for procedures "under the table."

For the reasons that follow, we conclude that Sykes has failed to carry his burden of demonstrating the probable merit of a defamation claim based on any of these allegations.

## A.  Before *and* After *Photographs*

Gilbert posted two sets of *before* and *after* photographs on her Web site with captions "Approximately one month *before* surgery" and "Approximately two weeks *before* surgery," each paired with a photo captioned

"Approximately [five] months *after* surgery." (Italics added.) Sykes's cross-complaint alleged that the photographs were misleading in that the *after* photo was taken after Gilbert had additional revision surgical procedures performed by other plastic surgeons. Gilbert, however, debunked this accusation in an uncontradicted declaration, wherein she stated that the *after* photograph was taken after Sykes's procedures and *before* any revision surgery was done on her face. Gilbert added that her facial muscles were at rest and her face in repose when the photographs were taken, thereby laying to rest any speculation that she tried to distort her natural appearance in order to cast the results of the surgery in a bad light.

■ " 'In all cases of alleged defamation, . . . the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.' " (*Ringler, supra,* 80 Cal.App.4th at p. 1180.) Because Gilbert submitted uncontradicted evidence the photographs were indeed what they purported to be, truth as a defense was established.

Sykes responds by focusing on minute details that do not detract from the essential accuracy of the photographs. He seizes on Gilbert's admission in her deposition that her first revision surgery was performed on June 24, 2003 (about four and one-half months after her February 5 surgery), and notes that at one time, Gilbert's Web site claimed the *after* photo was taken *five and one-half* months after the surgery.

The slight discrepancy in timeframe does not provide Sykes with an escape hatch from the truth defense. " 'It is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge be established by the evidence the defendant has made his case.' [Citation.] ' "[A] slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently . . . ." ' " (*Sipple, supra,* 71 Cal.App.4th at p. 244, quoting *Kurata v. Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224, 227 [40 P.2d 520].) Whether the photograph was taken five or even five and one-half months after the surgery rather than four and one-half is of little significance. The crucial point is that the photograph was taken *after* Sykes's surgery but *before* other doctors performed their revision surgeries. Because it was, the "gist" and "sting" of the allegedly libelous charge was shown to be true, and Sykes cannot base a defamation claim upon it. (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936 [19 Cal.Rptr.3d 247].)

Sykes also points to the declaration of Julie Hamilton, which he submitted in opposition to the special motion to strike. In it, Hamilton declared she took

screen snapshots of the photos on Gilbert's Web site with her Apple computer, aligned the two images, and then created a split-screen view. Based on these statements, Sykes argues that Gilbert's photos were taken from different angles and on a different scale.

Again, Sykes seeks to turn the court's attention away from the forest by focusing on the trees, or perhaps more accurately, a branch of one tree. Hamilton's declaration establishes, at most, that Gilbert did not compose her photographs with scientific precision. But the average reader cares little about geometrical accuracy—what is important is that the photographs were substantially accurate depictions of what Gilbert's face looked like before and after Sykes's surgery. Because Hamilton's declaration did not negate this fact, it did not help prove a prima facie case of defamation.

Since the *before* and *after* photographs were substantially accurate representations of what took place with respect to Sykes's surgery, they were not defamatory as a matter of law.

### B. Procedures that Gilbert Did Not Need/Want

Sykes next alleges that the Web site falsely indicated that Sykes recommended and performed procedures that Gilbert did not "need" or "want." Sykes finds support for this charge from two sources:

First, a passage that appeared on an earlier version of the Web site (since removed), which stated: "I met with [Dr. Sykes], the director of facial plastic and reconstructive surgery at [UC Davis] Medical Center. I knew him for a few years from my ex-boyfriend and had a lot of trust in him based on knowing and seeing him over the years and his impressive sounding title. I really wasn't sure what to expect when I met with him. He quickly suggested I would benefit from having *five* procedures to my face. I was told that if I did the suggested procedures, I would maintain my looks longer and age better into my late thirties and forties. He said I could be back to work in two weeks and that it would be *subtle*. Wow, he made it sound simple and easy—sign me up!"

Second, Sykes points to Gilbert's "final thoughts" at her Final Thoughts/Contact Me link: "For me surgery was the biggest regret of my life. I didn't *need* [*five*] procedures and I had no idea what I was really getting myself into. What I thought was going to be subtle turned into a nightmare." (Italics added.)

Weaving these two passages together, Sykes claims they are libelous because (1) he did not "quickly" suggest having the procedures, but only did

so after Gilbert informed him of her concerns; (2) he never told her she "needed" five procedures or any procedure for that matter; and (3) he did not state the changes would be subtle; in fact Gilbert told him to be "aggressive." His arguments are unpersuasive for several reasons:

First, Sykes does not deny that he *suggested* a variety of procedures and indeed, his deposition testimony admits as much. The *timing* of the suggestion during his conference with Gilbert is of no consequence because it has no impact on Sykes's reputation in the community. (Civ. Code, § 46.) No plastic surgeon can claim he lost business because his suggestions were too "quick."

Second, nowhere on the Web site does Gilbert state or imply that Sykes told her she "needed" the surgeries. Indeed, her use of the word "suggested" connotes just the opposite. Gilbert's wistful closing remark that she did not "need" the procedures, read in the proper context, simply indicates her regret at her eagerness to go ahead with the surgery without becoming fully informed, and her sorrow at the unfortunate consequences that ensued. No injurious falsehood can be extracted from Gilbert's statement that she did not "need" five procedures.

Third, Gilbert's statement that she thought the changes would be "subtle" is not very different from Sykes's own deposition testimony on the subject—"I told her that my goal was to make it so that at the end of her healing process, which could take several months, that she *look natural* after surgery and that *we didn't want to make too much change*." (Italics added.) These statements could be reasonably interpreted by a prospective patient as an assurance that the changes effected by the surgical procedures would be subtle.

The "gist" and "sting" of Gilbert's assertion that Sykes assured her the changes would be "subtle" was substantially true, regardless of whether Sykes ever used the word.[6] Thus, the imputation was protected by the truth defense. (*Ringler, supra*, 80 Cal.App.4th at p. 1181, citing *Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581–582 [51 Cal.Rptr.2d 891].)

Fourth and finally, Gilbert's alleged failure to disclose her direction to Sykes to "be aggressive" with the surgery does not leave her open to a charge of defamation. While she may have told him to be aggressive, she certainly did not intend for him to make her *look* aggressive, which was the asserted unhappy result of the surgery.

---

[6] Gilbert testified at her deposition that Sykes did indeed use the word "subtle" to describe the intended result of his procedures.

### C. Misstating "the Content of Communications" Between Gilbert and Sykes

The third major charge of the cross-complaint is that Gilbert's Web site "misstates the content of communications between [Gilbert] and Dr. Sykes relating to the procedures performed by Dr. Sykes." This allegation is far too vague and amorphous to support a cause of action for defamation.

In order to successfully resist a special motion to strike, a plaintiff must " ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is *both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson, supra*, 28 Cal.4th at p. 821, italics added.) If the pleadings are not adequate to support a cause of action, the plaintiff has failed to carry his burden in resisting the motion. (See *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1018–1019 [26 Cal.Rptr.3d 350] (*Vogel*);[7] *Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1018–1019 [132 Cal.Rptr.2d 602] ["[S]pecial motions to strike pursuant to section 425.16 'operate "like a demurrer or motion for summary judgment in 'reverse.' " ' " (*Briggs, supra*, 19 Cal.4th at p. 1123, citing *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 718–719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [plaintiff opposing Code Civ. Proc., § 425.13, subd. (a) motion, must demonstrate existence of legally sufficient claim that is supported by competent, admissible evidence]"], *Drum* was disapproved on another ground in *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055, 1065 [39 Cal.Rptr.3d 516, 128 P.3d 713]; see also *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073–1074 [112 Cal.Rptr.2d 397] [granting cross-complainant leave to amend pleadings in resisting a special motion to strike incompatible with statute's quick dismissal remedy].)

" 'The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' " (*Vogel, supra*, 127 Cal.App.4th at p. 1017, fn. 3, quoting *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5 [284 Cal.Rptr. 244].)

Sykes's allegation that Gilbert misstated the content of unspecified communications between him and Gilbert relating to unspecified procedures that he

---

[7] In *Vogel*, the appellate court held a plaintiff's failure to *plead* a legally sufficient claim for defamation was fatal to his opposition to the special motion to strike, but reached the evidentiary issues because the defect in pleadings was never raised in the trial court. (*Vogel, supra*, 127 Cal.App.4th at p. 1019.) Here, by contrast, Gilbert repeatedly objected in the trial court that Sykes's allegations lacked specificity and/or were inadequate to support a claim for defamation.

performed is a paradigm of vagueness, and does not even come close to the specificity required to state an actionable libel claim. (See *Dowling, supra*, 85 Cal.App.4th at p. 1421.) The charge contains no averment of a "provably false factual assertion," which is indispensable to any claim for defamation. (*Seelig, supra*, 97 Cal.App.4th at p. 809.)

Although we could well stop here, we also note that Sykes's evidentiary showing was also deficient. The gist of Sykes's charge is that Gilbert captioned the *after* photo with the question, "I was told by my doctor that this was a good result—that I looked better after his surgery—what do you think?" To prove the insinuation was defamatory, Sykes averred that he saw Gilbert only two and one-half, not five months after the surgery, and that he did not tell her it was a "good result," only that she was "healing well."

But Gilbert produced deposition testimony from Sykes that he told her on April 21 the results were "good and improving." Sykes may not impeach his own sworn testimony with contrary self-serving averments. (*Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522 [27 Cal.Rptr.3d 826].) The fact there was a two and one-half month discrepancy between the date of the photo and the date of Sykes's assurance that the results were "good" did not detract from the essential truth of the charge. Even if the representation with regard to the timeframe was inaccurate, Sykes utterly failed to show, by clear and convincing evidence, that it was made with actual malice, i.e., "knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710]; see *Vogel, supra*, 127 Cal.App.4th at pp. 1017–1018.)

For all of the above reasons, the "communication misstatements" allegation did not carry Sykes's burden of showing a probability of prevailing on the merits.

### D. "Under-the-table" Compensation

The last operative defamation allegation is that Gilbert's Web site "falsely suggests that Dr. Sykes was compensated for the procedures 'under the table.'" As the source for this charge, Sykes points to the Red Flags link with a page captioned "Things to look out for" with the sub-caption: "Doctors I would be cautious of." Therein, Gilbert includes a list of 10 warning signs to watch for when choosing a plastic surgeon, including: "If they seem preoccupied or distracted," "If they recommend more procedures than what you are seeking!" and "If a doctor downplays the risks or does not explain the risks of the procedure in detail." The seventh item on the list says: *"RUN if a doctor asks you to pay cash under the table* for any part of the surgery. This

says a lot about their ethics." (Italics added.) Sykes claims it is a *question of fact* whether this statement was susceptible of an interpretation that Gilbert was referring to him. We disagree.

■   Whether a statement is reasonably susceptible of a defamatory interpretation is a question of law for the court. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 647 [85 Cal.Rptr.2d 397].) "Where the words or other matters which are the subject of a defamation action are of ambiguous meaning, or innocent on their face and defamatory only in the light of extrinsic circumstances, the plaintiff must *plead* and *prove* that as used, the words had a particular meaning, or 'innuendo,' which makes them defamatory." (*Id.* at p. 645, italics added.) Sykes failed to carry his burden in either respect.

Nowhere on the Web site does Gilbert ever state or imply that Sykes accepted cash under the table. The cross-complaint contains no explanation how a statement made about doctors generally suggests that *Sykes* engaged in such unethical behavior.

Sykes's name is not mentioned once on the entire Red Flags link or its "Things to look out for: Doctors I would be cautious of" page. The "under the table" statement is couched as one of the 10 warning signs to look out for when choosing a doctor. More importantly, the entire section carries a significant preface not mentioned by Sykes that dispels any notion Gilbert is referring specifically to him: "[T]his is based on my own experience and is solely of my OWN opinion *after consulting with revision doctors all over the United States*, having multiple revisional surgeries, and *just researching as much as possible.*" (Italics added.) No reasonable reader of the Red Flags list who also read its preface would conclude that Gilbert was charging Sykes with each unscrupulous practice mentioned therein. Yet that is exactly the notion Sykes seeks to advance by claiming that one item on the list defamed him.

There is another, more compelling, reason why the under-the-table warning cannot give rise to a cause of action. Even if it could be understood to refer to Sykes, he offered no evidence that it was *false*. Conspicuously absent from Sykes's declaration in opposition to the motion is any denial that he accepted "cash under the table."

By failing to deny the charge of under-the-table payments, Sykes has tacitly admitted that the challenged statement was substantially true. (*Vogel, supra*, 127 Cal.App.4th at pp. 1021–1022.) Sykes has totally failed to carry his burden of showing, by " 'clear and convincing evidence,' " that the

imputation of under-the-table payments was false. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177] (*Blatty*).)

## V.  Other Torts

■  The constitutional privilege applies not merely to defamation but to "all claims whose gravamen is the alleged injurious falsehood of a statement." (*Blatty, supra,* 42 Cal.3d at p. 1042.) Thus, the collapse of Sykes's defamation claim spells the demise of all other causes of action in the cross-complaint such as intentional and negligent interference with economic advantage and intentional infliction of emotional distress, all of which allegedly arise from the same publications on Gilbert's Web site. (See *Seelig, supra,* 97 Cal.App.4th at p. 812.) As the state Supreme Court observed, " 'to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege.' " (*Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 245 [228 Cal.Rptr. 215, 721 P.2d 97], quoting *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 682 [197 Cal.Rptr. 145].)

Sykes maintains, however, that his claims for infliction of emotional distress and interference with economic advantage must be allowed to proceed because they are not based on the allegedly defamatory communications, but on Gilbert's use of a Google Sponsored Links function, which "constitutes a discrete item of misconduct." Not so.

According to Sykes's 2005 cross-complaint and declaration, a Google search of the words "Jonathan Sykes plastic surgery" would bring up Gilbert's Web site as a prominent result under the Sponsored Links portion of the "Results" page.

The only effect of the Sponsored Links function is to draw more attention to Gilbert's Web site than it otherwise might attract. But the statements on Gilbert's Web site either give rise to defamation claims or they do not. Nonactionable communications do not expose the speaker to liability merely because they are likely to reach a greater number of recipients.

The Sponsored Links allegation does not save the cross-complaint from dismissal under section 425.16.

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to grant Gilbert's special motion to strike and to conduct further proceedings in accordance with section 425.16. Gilbert shall recover her costs on appeal. (Cal. Rules of Court, rule 8.276(a)(2).)

Robie, Acting P. J., and Cantil-Sakauye, J., concurred.